# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

STANLEY BLACK & DECKER, INC.,    :
                              :
           Plaintiff,           :
                              :
              v.                    :      C.A. No. 12-1342-LPS
                              :
DAVID T. GULIAN;              :
JOHN A. ROBERTS;            :
ERIC N. RUBINO;              :
MANUEL A. HENRIQUEZ;       :
MARK S. DENOMME;          :
and ROY Y. LIU,              :
                              :
           Defendants.        :

---

Raymond J. DiCamillo, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE.
Joseph W. Hovermill, Joseph L. Beavers, Matthew R. Schroll, Alexander P. Creticos, MILES & STOCKBRIDGE P.C., Baltimore, MD.

     Attorneys for Plaintiff Stanley Black & Decker, Inc.

Gary W. Lipkin, DUANE MORRIS LLP, Wilmington, DE.
Matthew A. Taylor, James H. Steigerwald, Robert M. Palumbos, Lynne E. Evans, DUANE MORRIS LLP, Philadelphia, PA.

     Attorneys for Defendants David T. Gulian, John A. Roberts, Eric N. Rubino, Manuel A. Henriquez, Mark S. Denomme, and Roy Y. Liu.

---

## <u>MEMORANDUM OPINION</u>

September 30, 2014
Wilmington, Delaware

*[signature]*

**STARK, U.S. District Judge:**

Pending before the Court is Defendants David T. Gulian, John A. Roberts, Eric N.

Rubino, Manuel A. Henriquez, Mark S. Denomme, and Roy Y. Liu's (collectively,

"Defendants") Motion to Dismiss Plaintiff Stanley Black & Decker, Inc.'s ("Stanley" or "Black

& Decker" or "Plaintiff") Amended Complaint Pursuant to Rule 12(b)(6). (D.I. 16) For the

reasons set forth below, the Court will grant in part and deny in part Defendants' motion to

dismiss.

## I. INTRODUCTION

Plaintiff filed this action against Defendants on October 8, 2012, alleging securities

violations and common law tort claims, in relation to Black & Decker's acquisition through

merger of InfoLogix, Inc. ("InfoLogix"). (D.I. 1) On March 1, 2013, Defendants moved to

dismiss Plaintiff's claims for failure to state a claim. (D.I. 11) On April 5, 2013, Plaintiff

responded to Defendants' motion by filing its First Amended Complaint ("FAC"). (D.I. 14) On

May 6, 2013, Defendants moved to dismiss the FAC for failure to state a claim. (D.I. 16) The

parties completed briefing on the motion to dismiss on June 17, 2013. (D.I. 17, 18, 19) The

Court heard oral argument on the motion on November 25, 2013. (D.I. 23) ("Tr.")

## II. FACTUAL BACKGROUND

In August 2010, Stanley began negotiations with officers and directors of InfoLogix to

potentially acquire the company. (D.I. 14 at ¶ 26) Stanley sought to acquire InfoLogix on a debt-

free basis. (*Id.* at ¶ 32) As a result of the negotiations, Stanley agreed to acquire InfoLogix for

an enterprise value of $61,158,724 ("Stanley Acquisition"). (*Id.* at ¶ 27) On December 15,

2010, Stanley entered into a merger agreement ("Merger Agreement") with InfoLogix and

1

executed a Purchase and Sale Agreement ("PSA") with Hercules Technology I, LLC ("HTI") and

its parent company, Hercules Technology Growth Capital, Inc. ("Hercules"), which had advanced

money to InfoLogix in the course of the Stanley Acquisition. (*Id.* at ¶¶ 33, 36, 42) At all times

relevant to the Stanley Acquisition, Defendants Gulian, Roberts, and Rubino were senior officers

and directors of InfoLogix, and Defendants Henriquez, Denomme, and Liu were senior officers

and directors of Hercules. (*Id.* at ¶¶ 3-8) Between the fall of 2009 and closing of the Stanley

Acquisition on January 18, 2011, Defendants Henriquez, Denomme, and Liu served as directors

on the board of directors of InfoLogix as well. (*Id.* at ¶¶ 16-18) The Closing Memorandum for

the Stanley Acquisition was executed by Defendants Gulian, Roberts, and Rubino on January 18,

2011. (*Id.* at ¶ 41)

Before the Stanley Acquisition took place, InfoLogix had engaged two other financial

advisors, SSG Capital Advisors, LLC ("SSG") and Thomas Weisel Partners Group, Inc.

("TWP"), to help it secure financing. (*Id.* at ¶¶ 22, 24) InfoLogix's engagement agreements with

SSG and TWP required it to pay certain success fees. (*Id.* at ¶¶ 23, 25) These fees were not

disclosed to Stanley. (*Id.* at ¶ 79(e)) After the Stanley Acquisition, the two firms were owed

outstanding fees totaling nearly $5 million. (*Id.* at ¶¶ 1, 49) When SSG and TWP demanded

payment, Stanley investigated the claims and negotiated a settlement with SSG for $800,000 and

with TWP for $3,538,856, totaling $4,338,856. (*Id.* at ¶¶ 50, 52-54, 56-58) Consequently,

Stanley alleges that while it negotiated to acquire InfoLogix on a debt-free basis, instead it

absorbed nearly $5 million of transaction-related liabilities. (*Id.* at ¶ 49)

## III.  LEGAL STANDARDS

### A.  Motion to Dismiss

When presented with a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), courts conduct a two-part analysis. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, courts separate the factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions." *Id.* at 210-11. This first step requires courts to draw all reasonable inferences in favor of the non-moving party. *See Maio v. Aetna, Inc.*, 221 F.3d 472, 500 (3d Cir. 2000). However, the Court is not obligated to accept as true "bald assertions," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997), "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), or allegations that are "self-evidently false," *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

Second, courts determine "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This is a context-specific determination, requiring the court "to draw on its judicial experience and common sense." *Id.* at 679. At bottom, "[t]he complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a claim. *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted).

3

"[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (internal quotation marks omitted). Finally, although a non-fraud claim need not be pled with particularity or specificity, that claim must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* at 545.

## B. Applicable Pleading Standards

The sufficiency of pleadings for non-fraud claims is governed by Rule 8 of the Federal Rules of Civil Procedure, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Claims alleging fraud or mistake are assessed under Rule 9(b), which requires that "a party must state with particularity the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b), although "[m]alice, intent, knowledge, and other condition[s] of mind of a person may be averred generally," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).

For private securities fraud causes of action, the Private Securities Litigation Reform Act ("PSLRA") "imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). The PSLRA requires plaintiffs asserting a § 10(b) claim under the Securities and Exchange Act of 1934 to "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs*, 551 U.S. at 313 (citing 15 U.S.C. § 78u-4(b)(1)-(2)).

4

## IV. DISCUSSION

Plaintiff's FAC consists of five causes of action: Count I, alleging primary securities fraud liability under federal law, against Defendants Gulian, Roberts, and Rubino; Count II, alleging secondary securities fraud liability under federal law, again against Defendants Gulian, Roberts, and Rubino; Count III, alleging common law fraud against Gulian, Roberts, and Rubino; Count IV, alleging negligent misrepresentation against Defendants Gulian, Roberts, and Rubino; and Count V, alleging civil conspiracy against Defendants Gulian, Roberts, Rubino, Henriquez, Denomme, and Liu. (D.I. 14)

Defendants seek dismissal on several grounds. Defendants contend that Counts I-IV should be dismissed against all Defendants because they fail to adequately plead that the alleged misrepresentations caused Plaintiff to suffer economic loss. With regard to Defendant Rubino individually, Defendants contend that Counts I-IV fail to plead a misrepresentation, that Count I additionally fails to plead scienter, and that Count II fails to plead control person liability. Defendants further argue that Counts III and IV against Defendants Gulian, Roberts, and Rubino improperly attempt to convert contractual breaches into tort claims of fraudulent and negligent misrepresentation. Finally, Defendants argue that Count V against all Defendants fails to plead an overt act as well as malice, and is also barred by the intraconspiracy doctrine. The Court discusses each of these grounds below.

## A.    Count I against All Defendants[1]

### 1.    Economic Loss and Loss Causation

In a typical § 10(b) private action, a plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)). In the context of § 10(b), loss causation requires a plaintiff to "show both that (1) the plaintiff entered the transaction at issue in reliance on the claimed misrepresentation or omission (transaction causation) and (2) the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss (loss causation)." *McCabe v. Ernst & Young, LLP.*, 494 F.3d 418, 425 (3d Cir. 2007); *see also Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 222 (3d Cir. 2006). "Ordinary pleading rules are not meant to impose a great burden on a plaintiff, but it should not prove burdensome for a plaintiff suffering economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 337.

Defendants contend that the FAC fails to adequately plead two elements of the § 10(b) and Rule 10b-5 cause of action: (1) "economic loss" and (2) "loss causation." In Defendants'

---

[1]Without explanation, Defendants assert that Counts II, III, and IV are all based on the same misrepresentation as Claim I, and further assume that those separate counts must also satisfy the pleading requirements of "loss causation" required for the § 10(b) claim alleged in Count I. (D.I. 17 at 4) Count II concerns secondary liability under § 20(a), while Counts III and IV are state law claims for fraud and negligent misrepresentation. Defendants provide no support for their supposition that § 10(b) claim pleading requirements govern these distinct claims.

view, the FAC alleges only that Plaintiff paid an inflated sales price for InfoLogix, or, alternatively, that Plaintiff did not receive what it bargained for, neither of which satisfy the pleading standard as a matter of law under *Dura* and *McCabe*. (D.I. 17 at 5-7) By contrast, Plaintiff rejects this characterization of the pleadings and argues it alleged a concrete, compensable harm, in that it negotiated to acquire "a debt-free company" but instead acquired a company with "significant outstanding liabilities." (D.I. 18 at 8) The Court agrees with Plaintiff that the two elements are adequately pled.

Despite Defendants' view to the contrary, Plaintiff has not alleged it satisfies "loss causation" simply by alleging it paid an "inflated sales price," a theory that has been rejected under *Dura* and *McCabe*. In *Dura*, 544 U.S. at 340, the Supreme Court analyzed the "loss causation" element of a § 10(b) claim in which the plaintiffs alleged that, in "reliance on the integrity of the market, [the plaintiffs] . . . paid artificially inflated prices for Dura securities," and further alleged that the plaintiffs suffered damages as a result. Critically, the complaint did not allege that Dura's share price fell *after* the truth became known about false statements regarding pending FDA approval of Dura's spray devices; instead, the complaint relied purely on an allegation of inflated purchase price. *See id.* at 347. The Court held this insufficient, reasoning that:

> [A]s a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value. If, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells

7

> such shares, even at a lower price, that lower price may reflect, not
> the earlier misrepresentation, but changed economic circumstances,
> changed investor expectations, new industry-specific or
> firm-specific facts, conditions, or other events, which taken
> separately or together account for some or all of that lower price.

*Id.* at 342-43. As a result, the Court held that "in cases such as this one (i.e., fraud-on-the-market

cases), an inflated purchase price will not itself constitute or proximately cause the relevant

economic loss." *Id.* at 342.

By contrast, in *McCabe*, 494 F.3d at 433, the Third Circuit stated that *Dura* "fraud on the

market" securities cases did not directly control. The defendant, Vertex, failed to register the

shares it offered in consideration for its acquisition of plaintiff, ATS, such that ATS "could not

simply turn around and re-sell the unregistered Vertex shares they had received." *Id.* The Court

of Appeals proceeded to analyze ATS's "loss causation" pleading, which was predicated on the

fact that after closing, when the share price dropped, ATS alleged it learned of Vertex's (a)

failure to pay its vendors, (b) failure to properly manage expenses, (c) breach of various payment

and stock registration obligations, and (d) failure to properly manage its business. *See id.* at 421.

Although ATS's § 10(b) claim was not precluded by *Dura*, the Third Circuit found "the logic of

*Dura* persuasive" to the matter before it, citing *Dura*'s reasoning that "the logical link between

the inflated ***share purchase price*** and any later economic loss is not invariably strong," but

"[g]iven the tangle of factors affecting price, the most logic alone permits us to say is that the

higher purchase price will sometimes play a role in bringing about a future loss." *Id.* at 432-33

(quoting *Dura*, 544 U.S. at 342-43) (emphasis added).

Here, the propositions regarding inflated share price in *Dura* and *McCabe* are inapposite.

Nowhere does Plaintiff plead that the loss it suffered occurred due to inflated share price. (*See*

8

*generally* D.I. 14) As pled, the "loss causation" here is that Defendants' misrepresentation that there were no "outstanding transaction-related liabilities" caused the Plaintiff to take on a company that actually had "$5 million in transaction-related liabilities." (*Id.* at ¶ 49) Accordingly, Plaintiff's pleadings here are not of the type involved in *Dura* and *McCabe*, in which the "tangle of factors affecting price" of stocks severed the causal link between "inflated" stock price and the alleged misrepresentation.[2] Because Defendants cannot point to any authority that so broadly extends *Dura*'s proposition beyond transactions involving allegations of inflated share prices, Defendants' argument will be rejected.

## 2. Direct or Derivative Claim

Alternatively, Defendants argue that Plaintiff, as a shareholder of InfoLogix, is attempting to manufacture economic loss by electing to pay InfoLogix's obligations to SSG and TWP and, as a consequence, lacks standing for suing on what are properly characterized as derivative claims. *See Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 732 (3d Cir. 1970) ("A stockholder of a corporation does not acquire standing to maintain an action in his own right . . . when the alleged injury is inflicted upon the corporation and the only injury to the shareholder is the indirect harm which consists in the diminution in value of his corporate shares.").

The flaw in Defendants' argument is that the alleged injury – economic loss due to misrepresentation – was not inflicted *on InfoLogix*. Defendants – directors and officers of

---

[2]With regard to the pleading standard for "loss causation," the *McCabe* Court distinguished between (i) typical "fraud-on-the-market" § 10(b) actions, in which a "plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff," *McCabe*, 494 F.3d at 425-26, and (ii) non-typical § 10(b) actions, "where the plaintiff does not simply allege that the price of a publicly-traded security has been affected" and, consequently, "the factual predicates of loss causation fall into less of a rigid pattern," *id.* at 426.

9

InfoLogix (D.I. 14 at ¶¶ 3-8) – are not alleged to have made any misrepresentations to InfoLogix.

In turn, the injury is not indirect harm to shareholders through diminution of InfoLogix's shares.

Rather, the alleged injury here is economic loss from a misrepresentation made *to Stanley* during

the acquisition of InfoLogix. (*Id.* at ¶¶ 79, 83, 88) While Stanley is now a shareholder of

InfoLogix, the FAC alleges an injury inflicted directly on Stanley. Hence, this action does not

involve a derivative claim.

## B.    Count I against Rubino[3]

### 1.    Misrepresentation

Defendants contend Stanley fails to allege in Count I "a misrepresentation" by Defendant

Rubino. The PSLRA requires "the complaint shall specify each statement alleged to have been

misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding

the statement or omission is made on information and belief, the complaint shall state with

particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4.

The Court finds Plaintiff satisfies the requirements of the PSLRA pleading standard.

Stanley pled that Defendant Rubino, in his capacity as Chief Operating Officer ("COO"),

"executed the Closing Memorandum, which set forth the payments all parties would make at the

Stanley Acquisition closing." (D.I. 14 at ¶ 5; *see also id.* at ¶ 41) As required by the PSLRA, the

FAC goes on to specify the statements alleged to be misleading and the reasons why they are

misleading. Particularly, the FAC pleads "[a]s expressly set forth in the documents underlying

_____

[3]Defendants once more conflate the pleading requirements of the § 10(b) claim in Count I
with the standards applicable to Counts II, III, and IV. As noted above, the Court rejects this
position. (*See supra.* n.1.) Furthermore, as explained below, the Court finds that Count I
adequately pleads "a misrepresentation" against Rubino under the heightened PSLRA standard.

these transactions, all parties ***specifically intended that Stanley would acquire a company***
***without any outstanding transaction-related liabilities***," and "[p]ursuant to Section 5.11 of the
Merger Agreement, ***InfoLogix was obligated to pay all of its transaction-related expenses***
incurred prior to the Stanley Acquisition closing date, including compensation owing to any of its
financial advisors." (*Id.* at ¶¶ 32-33) (emphasis added) Attached to the FAC, the Closing
Memorandum states "[p]ursuant to Section 5.11 of the Merger Agreement, all of the Expenses
incurred by the Company have been paid prior to Closing." (*Id.* Ex. C at § F) As Plaintiff notes,
the defined terms of the Merger Agreement were expressly incorporated into the Closing
Agreement and define "Expenses" as "***all expenses and fees* . . . incurred by any party**" in
relation to the Stanley Acquisition. (D.I. 18 at 11) (emphasis added)

The Court concludes Plaintiff has adequately pled the "misrepresentation" element in its
§ 10(b) action against Rubino.

### 2.    Scienter

Defendants also contend the FAC fails to adequately plead that Defendant Rubino acted
with the requisite scienter. To establish liability under § 10(b), "a private plaintiff must prove
that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or
defraud.'" *Tellabs,* 551 U.S. at 319. Accordingly, under the applicable pleading standard, "the
complaint shall, with respect to each act or omission alleged to violate this chapter, state with
particularity facts giving rise to a ***strong inference*** that the defendant acted with the required
state of mind." 15 U.S.C. § 78u-4 (emphasis added); *see also Tellabs*, 551 U.S. at 321 ("The
'strong inference' standard 'unequivocally raise[d] the bar for pleading scienter.'"). A complaint
will create a "strong inference" sufficient to survive "only if a reasonable person would deem the

inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences,'" but it must be "more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations." *Id.*

The Court agrees with Defendants that Plaintiff's FAC fails to meet this heightened pleading standard for scienter. Stanley alleges that as COO of InfoLogix, Rubino executed the Closing Memorandum, (D.I. 14 at ¶¶ 5, 95), and knew of the fees owed to SSG and TWP as a result of attending board meetings in 2010 "in which the subject of possible transactions and financial advisors was discussed" (*id.* at ¶ 84(b)). In particular, Plaintiff points to two board meetings: a January 19, 2010 InfoLogix board meeting at which two members of SSG "provided the Board with a summary of their recent activities related to seeking potential strategic alternatives for InfoLogix" (*id.* at ¶ 61), and an August 2010 meeting at which a member of SSG "led a discussion of a proposed term sheet offered by a strategic buyer recently received by SSG" (*id.* at ¶ 70). Analyzing the pleadings collectively, *see Tellabs*, 551 U.S. at 323, there is nothing to indicate that the terms of the SSG and TWP engagements were discussed at either board meeting, especially in relation to the Stanley Acquisition; indeed, the FAC itself establishes that negotiations with Stanley did not begin until after those board meetings (D.I. 14 at ¶ 26). Without more, these allegations do not allow a reasonable person to deem the inference of scienter "cogent and at least as compelling as the opposing inference" that Rubino attended these meetings with SSG and TWP but fees specifically related to the Stanley Acquisition were not yet under discussion.

Defendant also pleads that Rubino had a personal financial motive to effectuate the Stanley Acquisition as quickly as possible (*id.* at ¶ 76), but this does not amount to an adequate pleading of scienter under the PSLRA either. *See Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 277 (3d Cir. 2009) ("[The] conclusion that 'motive and opportunity' may no longer serve as an independent route to scienter follows also from *Tellabs*'s general instruction to weigh culpable and nonculpable inferences.").

As a result, the Court finds Plaintiff has not sufficiently pled scienter for its § 10(b) action against defendant Rubino. Count I for primary liability against Rubino is, therefore, dismissed.

## C.    Secondary Liability Against Rubino (Count II)

Count II of the FAC alleges control person liability against Rubino for violation of § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). An action for control person liability under § 20(a) requires that a plaintiff establish: "(1) an underlying violation by a controlled person or entity; (2) that the defendants are 'controlling persons;' and (3) that the defendants were in some meaningful sense culpable participants in the fraud." *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 560 (D. Del. 2002) *aff'd*, 357 F.3d 322 (3d Cir. 2004).

### 1.    Underlying violation by a controlling person or entity

As an initial matter, Defendants contend that secondary liability cannot be imposed on Defendant Rubino because Stanley has failed to state a claim for a primary violation of the securities laws under § 10(b). (D.I. 17 at 11) (citing *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 285 (3d Cir. 2010) ("Because we find there was no violation under Section 10(b), and no other violations are alleged, there is no controlling person liability under Section 20.")).

However, as noted above, Defendants have not successfully attacked the sufficiency of

13

pleadings as to Plaintiff's § 10(b) claims against Gulian and Roberts. Furthermore, Defendants have not challenged the sufficiency of the allegation that Gulian and Roberts "had control over the day-to-day management and policies of InfoLogix and approved the [documents] containing the various referenced factual misrepresentations and omissions." (D.I. 14 at ¶ 95) Therefore, Plaintiff has adequately pled "an underlying violation by a controlling person or entity."

### 2.    Controlling Persons and Culpability

Defendants next argue that the pleadings fail to allege "control or culpable participation" by Rubino. Because the legal conclusion that a defendant is a control person cannot be accepted as true without factual support, the PLSRA's heightened pleading standard "requires that a claim under Section 20(a) state with particularity the circumstances of both [i] the defendants' control of the primary violator, as well as of [ii] the defendants' culpability as controlling persons." *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d at 561.

Plaintiff here has pled with particularity the circumstances of "the defendants' *control* of the primary violator." Plaintiff has alleged Rubino was the COO of InfoLogix (D.I. 14 at ¶ 5), was actively involved in the daily activities of the company (*id*. at ¶ 95), attended board meetings led by members of SSG about possible transactions (*id*. at ¶ 84(b)), and was actively responsible for the execution of the Stanley Acquisition by signing the Closing Agreement (*id*. at ¶ 79(d)). While courts have found that position – such as being a director – is not alone sufficient to establish control over a particular transaction, *see In re Digital Island*, 223 F. Supp. 2d at 561-62, the Court finds here the additional alleged facts, especially Rubino's execution of the Closing Agreement, are sufficient to plead Rubino had control.

The PSLRA also requires the pleadings allege with particularity the circumstances of "the

14

defendants' *culpability* as controlling persons." On this point Stanley's pleadings are inadequate. Stanley provides no allegations as to how Rubino specifically knew about the fees owed to the financial advisors. (*See* D.I. 17 at 13) As discussed earlier, the pleadings only speak of two board meetings Rubino attended at which potential transactions were discussed, but without any specific reference to the fees owed to SSG or TWP for the Stanley Acquisition. Conclusory allegations about culpability "utterly lacking in any details as to when or how this occurred" are not sufficient; "[a]t best, the complaint alleges a factual predicate for the individual defendants' knowledge of the purported misstatements." *In re Digital Island*, 223 F. Supp. 2d at 563 ("Such allegations alone are insufficient to establish Section 20(a) culpability.").

The FAC does not meet the PSLRA pleading standard for this necessary element of its secondary liability claim. Consequently, the Court dismisses Count II against Defendant Rubino.

## D. Fraud and Negligent Misrepresentation (Counts III & IV)

### 1. Choice of Law

The parties dispute whether Pennsylvania or Connecticut law controls the analysis for Plaintiff's common law claims of fraud and negligent misrepresentation (Counts III & IV). In exercising supplemental jurisdiction over Plaintiff's pendent state law claims, the Court applies the substantive law of the forum state, *see Felder v. Casey*, 487 U.S. 131, 151 (1988) (applying *Erie* doctrine to pendent claims), and, therefore, Delaware's choice of law rules govern this inquiry. *See Sys. Operations, Inc. v. Scientific Games Dev. Corp.*, 555 F.2d 1131, 1136 (3d Cir. 1977) (citing *UMW v. Gibbs*, 383 U.S. 715, 726 (1966)). Delaware uses the "most significant relationship" test of the Restatement (Second) of Conflict of Laws ("The Restatement") § 145(1).

15

*See Travelers Indem. Co. v. Lake*, 594 A.2d 38, 40 (Del. 1991).[4]

Delaware's choice of law rule follows § 145(1) of the Restatement, which provides that the governing law is "the law of the state with the most significant relationship to the occurrence and the parties" under the principles stated in § 6. *State Farm Mut. Auto. Ins. Co. v. Patterson*, 7 A.3d 454, 457 (Del. 2010). When applying the seven general factors set out in § 6,[5] courts contemplate the following four "contacts": "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Id.* (discussing § 145(2)).

With regard to fraud and misrepresentation claims in particular, subsequent decisions, while not controlling, have also applied § 148 to the general analysis under § 6. *See Pennsylvania Employee, Benefit Trust Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 475 (D. Del.

---

[4]Some courts have read Delaware's choice of law inquiry as requiring a two-part analysis, with the initial prong being that a court "compare the laws of the competing jurisdictions to determine whether the laws actually conflict." *Mills Ltd. P'ship v. Liberty Mut. Ins. Co.*, 2010 WL 8250837 (Del. Super. Nov. 5, 2010) (citation omitted); *see also In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 358 (3d Cir. 2007). The parties have articulated an existing conflict between Pennsylvania's "gist of the action" doctrine and Connecticut's "economic loss rule." (D.I. 17 at 13-16; D.I. 18 at 16)

[5]Section 6(2) provides seven factors relevant to the choice of law inquiry:

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

*Patterson*, 7 A.3d at 457.

2010). Section 148(2) provides that when "the plaintiff's action in reliance took place in whole

or in part in a state other than that where the false representations were made," the court will

consider the following contacts, among others, to determine which state has the "most significant

relationship" to the occurrence and the parties:

> (a) the place, or places, *where the plaintiff acted in*
> *reliance* upon the defendant's representations, (b) the place
> *where the plaintiff received the representations*, (c) the
> place *where the defendant made the representations*, (d)
> the domicil, residence, nationality, *place of incorporation*
> *and place of business of the parties*, (e) the place *where a*
> *tangible thing which is the subject of the transaction*
> between the parties was situated at the time, and (f) the
> place *where the plaintiff is to render performance* under a
> contract which he has been induced to enter by the false
> representations of the defendant.

(Emphasis added) Courts applying both § 148 and § 6 first examine "the tentative conclusion

reached by applying the § 148 factors" and then measure it "against the principles of § 6 to

determine whether that forum actually has the most significant relationship to the underlying

tort." *Zeneca*, 710 F. Supp. 2d at 470 (applying § 148(2) factors first and finding § 6 factors did

not undermine conclusion that law of forum where plaintiff resided and where plaintiff relied on

alleged misrepresentations by purchasing product there had most significant relationship to the

claim).[6]

In light of the pertinent factors, the Court finds that the law of Connecticut has the most

significant relationship to Plaintiff's claims and therefore governs. With regard to the § 148

---

[6] *See also Atl. City Elec. Co., Inc. v. Estate of Riccardo*, 682 F. Supp. 2d 498, 505 (E.D.
Pa. 2010) (analyzing New Jersey choice of law by first assessing whether § 148 factors point to
particular jurisdiction and then considering if § 6 considerations "gin up or diminish the values
ascribed to the contacts relative to the issue presented") (citing *P.V. ex rel. T.V. v. Camp Jaycee*,
962 A.2d 453, 463 (2008)).

factors, Plaintiff acted in reliance on Defendants' alleged misrepresentation in large part in the

state of Connecticut (D.I. 14 at ¶¶ 44, 45, 48) and the Court is persuaded that this factor carries

particular weight. *See* Restatement (Second) of Conflict of Laws § 148 cmt. f (1971) ("When

plaintiff's action in reliance is taken pursuant to the terms of an agreement made by the plaintiff

with the defendant . . . ***the place of reliance is a more important contact*** than it is in other

situations, such as where the plaintiff, without the knowledge of the defendant, purchases certain

equipment from a third person.") (emphasis added). Relatedly, Plaintiff is domiciled in

Connecticut, where it is incorporated and maintains its principal place of business.[7] (D.I. 1 at 2)

As for the third § 148 factor, Defendant did make the representations from Pennsylvania

and New York, where counsel for InfoLogix and Hercules were located, respectively. (D.I. 19 at

5-6) However, because a majority of the negotiations for the Stanley Acquisition took place via

conference call (D.I. 14 at ¶ 44), Plaintiff received those representations through its principal

corporate representatives, who were located in Connecticut, Maryland, and Indiana during the

Stanley Acquisition (D.I. 18 at 7). The "place where the plaintiff received the representations"

constitutes "approximately as important a contact as does the place where the defendant made the

representations," § 148 cmt. g (1971), and the Court, therefore, finds these factors essentially

balance out one another. *See also* Restatement (Second) of Conflict of Laws § 148 cmt. h (1971)

("The making of the representations provides a more important contact when the representations

---

[7]*See Zeneca*, 710 F. Supp. 2d at 472 (citing § 148 cmt. j) ("[W]hen a plaintiff acted in reliance in one jurisdiction, 'this state will usually be the state of the applicable law, with respect to most issues, if (a) the defendant's representations were received by the plaintiff in this state, or (b) this state is the state of the plaintiff's domicil or principal place of business, or (c) this state is the situs of the land which constituted the subject of the transaction between the plaintiff and the defendant, or (d) this state is the place where the plaintiff was to render at least the great bulk of his performance under his contract with the defendant.").

are made only in one state than when they are made in two or more.").

To the extent InfoLogix and its assets can be considered "a tangible thing which is the subject of the transaction," this factor weighs in favor of applying Pennsylvania law. But this factor does not outweigh the fact that Plaintiff acted in reliance on the misrepresentations primarily in Connecticut, where it received the representations and maintained its principal place of operations.

Finally, the Court does not find that the any of the § 6 factors weigh against its conclusion based on the § 148(2) factors that Connecticut has the most substantial relationship to the underlying tort. Therefore, Connecticut law applies.

## 2. The Economic Loss Rule[8]

Defendants' contend Connecticut's "economic loss rule" bars Plaintiff from pleading its tort claims of fraud and misrepresentation, as such causes of action cannot sound in both tort and in contract.[9] (D.I. 19 at 7-8) However, the economic loss rule "generally applies only to contracts for the sale of goods." *Aliki Foods, LLC v. Otter Valley Foods, Inc.*, 726 F. Supp. 2d 159, 165-66 (D. Conn. 2010) (explaining "the origin of which 'lies not in the broad common law of torts or contracts, but in the narrower, express provisions of Article 2 of the Uniform Commercial Code, which establishes special rules governing the remedies available for breaches of commercial contracts for the sale of goods'") (citation omitted). Furthermore, even in the case

---

[8]Given that Connecticut law governs, Defendants' arguments related to the gist of the action doctrine under Pennsylvania law (D.I. 17 at 13-16) are moot.

[9]Under Connecticut law, fraud requires: "(1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury." *Updike, Kelly & Spellacy, P.C. v. Beckett*, 850 A.2d 145, 166 (2004).

of "hybrid transactions," in which the seller supplies both goods and services and a court finds under the "dominant factor" test the sale of the material is the "essence of the transaction," courts have carved out exceptions to the economic loss rule, particularly for intentional torts such as fraud. *Id.* at 166 (quoting *Nora Beverages, Inc. v. Perrier Gr. of Am.*, 164 F.3d 736, 747 (2d Cir. 1998)). Indeed, the Supreme Court of Connecticut has allowed such claims to sound in both tort and contract. *See, e.g., Williams Ford, Inc. v. Hartford Courant Co.*, 657 A.2d 212, 222 (1995) ("[A] remedy on the contract is independent of a remedy for negligent misrepresentation. The dealerships were not barred from pursuing a negligence claim solely because they also might have had a breach of contract claim.").

Here, the transaction at issue was not a straight sale of goods, and the economic loss rule is inapplicable. Even under a "hybrid transaction" theory – and assuming the Court found the tangible assets of InfoLogix to constitute the "essence of the transaction" under the dominant factor test – Plaintiff's Counts III and IV plead the intentional torts of fraud and misrepresentation, which are typically outside the scope of the economic loss rule. Consequently, the Court is unpersuaded by Defendants' argument that Plaintiff's intentional tort claims are precluded as a matter of law by the economic loss doctrine. The Court denies Defendants' motion to dismiss Counts III and IV on this basis.

## C. Civil Conspiracy (Count V)

The elements of a civil action for conspiracy under Connecticut law are: "(1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff."

*Macomber v. Travelers Prop. & Cas. Corp.*, 894 A.2d 240, 254 (2006).[10] For a civil conspiracy

claim, Rule 8(a) requires a plaintiff to include a "short and plaint statement of the claim showing

that the pleader is entitled to relief." *Parker v. Google, Inc.*, 242 F. App'x 833, 839 (3d Cir. July

10, 2007) ("[T]he District Court did not abuse its discretion in dismissing [civil conspiracy]

claims for failing to comply with Rule 8(a).").

## 1. Overt Act

Defendants argue that Plaintiff has neglected to plead facts indicating that all Defendants

committed an act done by one or more of the conspirators pursuant to the scheme and in

furtherance of it. With regard to Defendants Gulian and Roberts, the Court finds Plaintiff's

pleadings are adequate.

Plaintiff alleges that Roberts sent an email on June 23, 2010, weeks before the Stanley

Acquisition negotiations began, to Gulian stating, "Hercules has been asking about all the

engagement letters, and I committed to working them through. We are not going to address the

TWP agreement, think it is better to let it hang out there. No sense in waking the sleeping dog."

(D.I. 14 at ¶¶ 68, 133(c)) The pleadings allege a specific act coordinated between Roberts and

Gulian to conceal at least the TWP fee, which is a facially plausible "act" in furtherance of the

object of the conspiracy. *See Iqbal*, 556 U.S. at 678 (holding claim is facially plausible "when

---

[10]"There is no independent claim of civil conspiracy . . . . To state a cause of action, a claim of civil conspiracy must be joined with an allegation of a substantive tort." *Larobina v. McDonald*, 876 A.2d 522, 531 (Conn. 2005). As the Court is denying Defendants' motion to dismiss Count III-IV, Defendants have not supported their contention that Plaintiff has failed to plead an underlying tort to satisfy this requisite element in Count V. (D.I. 17 at 19-20) In addition, Defendants have failed to show that Connecticut law requires a party pleading civil conspiracy to plead "malice," so to the extent Defendants fault Plaintiff for failing to plead malice (D.I. 17 at 18-19), this argument fails.

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

As for the remaining Defendants – Rubino, Henriquez, Denomme, and Liu – Plaintiff relies generally on paragraphs 59-74 and paragraphs 131-139 of the FAC to satisfy the "overt act" element. However, other than pleading attendance at board meetings at which SSG presented information on some of its activities in pursuing potential transactions with parties interested in InfoLogix (D.I. 14 at ¶ 70), there is no indication Rubino or Henriquez committed any act "in furtherance of the object" of the conspiracy. The pleadings allege that Denomme and Liu were aware that the SSG and TWP engagements were "never terminated" (*id.* at ¶ 64), but the pleadings allege no act or omission by these defendants thereafter. Rather, the pleadings focus on specific activities of Roberts, and to a lesser extent, Gulian, to carry the Stanley Acquisition forward. Otherwise, the pleadings only generally allege that all Defendants entered into "an unlawful and tortious agreement and conspiracy" (*id.* at ¶ 131), which, without more, falls short of the pleading standard, *see Harvey v. Loftus*, 505 F. App'x 87, 90 (3d Cir. Nov. 27, 2012) ("[I]t is a longstanding rule in the Third Circuit that a mere general allegation . . . of conspiracy or collusion without alleging the facts which constituted such conspiracy or collusion is a conclusion of law and is insufficient [to state a claim]." (alteration in original)).

As a result, after separating the factual and legal elements of the claim and accepting all of the FAC's well-pleaded facts as true, the Court finds that the pleadings against these four Defendants – Rubino, Henriquez, Denomme, and Liu – are insufficient to state a plausible claim for relief, as they fail to adequately plead an overt act in furtherance of the object of the conspiracy. *See Fowler*, 578 F.3d at 210-11 (quoting *Iqbal*, 556 U.S. at 679).

## 2. **Intracorporate Conspiracy Doctrine**

Finally, Defendants contend that Count V is barred as a matter of law by the intracorporate conspiracy doctrine and should be dismissed in its entirety. The doctrine provides that "employees acting within the scope of their employment cannot conspire with each other or with the corporation that employs them." *Harp v. King*, 835 A.2d 953, 971 (2003). "[F]or a claim of intracorporate conspiracy to be actionable, the complaint must allege that corporate officials, employees, or other agents acted outside the scope of their employment and engaged in conspiratorial conduct to further their own personal purposes and not those of the corporation." *Id.* at 974. To determine whether an employee has acted within the scope of employment, courts look to whether the employee's conduct: "(1) occurs primarily within the employer's authorized time and space limits; (2) is of the type that the employee is employed to perform; and (3) is motivated, at least in part, by a purpose to serve the employer." *Id.*

"Ordinarily, it is a question of fact as to whether a willful tort of the servant has occurred within the scope of the servant's employment . . . [b]ut there are occasional cases [in which] a servant's digression from [or adherence to] duty is so clear-cut that the disposition of the case becomes a matter of law.*" A-G Foods, Inc. v. Pepperidge Farm, Inc.*, 579 A.2d 69, 73 (1990); *see also Harp*, 835 A.2d at 974-75 (treating inquiry as question of law where "there is nothing in the record from which a fact finder could conclude that the defendants' allegedly tortious conduct had occurred outside the scope of their employment").

Plaintiff has pled that each Defendant acted with "an independent, personal financial incentive" to deceive the Defendant, entirely separate from any purpose of serving its employer, InfoLogix. (D.I. 14 at ¶ 75) The present case is not one in which the servant's digression from

23

or adherence to duty is "so clear cut that the disposition of the case becomes a matter of law." It remains a question of fact for the factfinder as to whether Defendants' alleged personal financial incentives were so strong as to cause them to act "outside the scope of their employment."

Thus, Defendants' motion to dismiss Count V for failure to state a claim is denied with respect to Defendants Roberts and Gulian and granted with respect to Defendants Rubino Henriquez, Denomme, and Liu.

## V. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Defendants' motion to dismiss. An appropriate Order follows.

24